IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHARLES SCHWAB & CO., INC.,    )
                               )
            Plaintiff,         )
                               )
      v.                       )
                               )   Civil Action No. 1:16cv0352 (AJT/IDD)
WS WEALTH MANAGEMENT,          )
LLC, *et al.*,                 )
                               )
            Defendants.        )
_____ )

## MEMORANDUM OPINION

Plaintiff Charles Schwab & Co. ("Schwab") seeks a judgment against the Defendants based on a judgment it previously obtained through an arbitration award against Bluemont Capital Advisors, L.L.C. ("Bluemont"). Schwab claims in that regard that Defendant WS Wealth Management, L.L.C. ("WS Wealth"), whose members are Defendants Jonathan David Wagner ("Wagner") and Mark Stys ("Stys"), is a mere continuation of Bluemont. Bluemont's members were Wagner, Stys and Stys' wife, Carolyn Stys (collectively, the "individual Defendants"). Schwab also claims that the individual Defendants, while acting as members or managers of Bluemont, breached their obligations to Schwab as a creditor and otherwise acted unlawfully when they distributed certain payments to themselves during Bluemont's winding down and dissolution after Bluemont had been rendered insolvent as a result of an arbitration award against it and a subsequent judgment of this Court enforcing that arbitration award. According to Schwab, these individual Defendants then orchestrated the creation of WS Wealth and the transfer of nearly all of Bluemont's clients to WS Wealth in order to avoid payment of Schwab's judgment against Bluemont. More specifically, Schwab asserts claims for (1) successor liability against WS Wealth (Count I), (2) fraud against WS Wealth (Count II); (3)

conspiracy against WS Wealth (Count III); (4) breach of fiduciary duty against Wagner and Stys (Count IV); (5) aiding and abetting breach of fiduciary against Carolyn Stys (Count V); and (6) imposition of a trust or equitable lien on all monies paid to the individual Defendants during the period of Bluemont's insolvency (Count VI).[1]

Following the completion of discovery, the parties each filed a motion for summary judgment as to all counts [Doc. Nos. 39 and 46].  On October 7, 2016, the Court held a hearing on those motions, following which the Court took both motions under advisement.  For the reasons stated herein, the Court concludes as a matter of law, based on undisputed facts, that (1) WS Wealth is a mere continuation of Bluemont, created so as to avoid Schwab's judgment against Bluemont; (2) Schwab's successor liability claim against WS Wealth is not barred by the applicable statute of limitations; (3) Schwab's conspiracy claim against WS Wealth is barred by the intra-corporate/entity doctrine; (4) Defendant WS Wealth did not engage in actionable fraud; and (5) the individual Defendants did not breach any duties or obligations to Schwab as a creditor in their capacity as managers and members of Bluemont.  Based on these conclusions, the parties' cross-motions for summary judgment will be granted in part and denied in part.  Schwab's motion is GRANTED as to Count I of the Complaint and otherwise DENIED.  Defendants' motion is GRANTED as to Counts II, III, IV, V, and VI and otherwise DENIED.

---

[1] Schwab initially filed its complaint ("Compl.") on April 1, 2016.  On May 2, 2016, Defendants moved to dismiss Schwab's claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and for failure to establish fraud (Count II) with the particularity required under Federal Rule of Civil Procedure 9(b).  On May 20, this Court granted Defendants' 12(b)(6) motion with respect to Count VII (Monies Had and Received) and otherwise denied both motions to dismiss.  [Doc. No. 17.]  The 12(b)(1) motion was dismissed without prejudice, however, in order to permit Defendants "leave to renew that Motion following the Bankruptcy Court's decision on the pending Motion to Dismiss Pursuant to 11 U.S.C. § 1112(b) . . . ."  *Id.*  On July 6, 2016, the Bankruptcy Court dismissed the Chapter Eleven case filed by WS Wealth, but Defendants did not renew their 12(b)(1) motion.

## I.      FACTUAL RECORD

Unless otherwise stated herein, the following facts are undisputed:

Bluemont operated as a registered investment advisory firm ("RIA"), which provided investment advice to retail clients in exchange for fees.  Because Bluemont was not a registered broker-dealer, it was prohibited, however, from taking custody of client assets.  Instead, those assets were held by Schwab, which is a registered broker-dealer authorized by the Financial Industry Regulation Authority ("FINRA") to take custody of client assets and provide a variety of investment services.  Bluemont maintained a contractual relationship with Schwab in order to provide those custodial and trading services to Bluemont's clients under the Schwab "platform." Under this arrangement, Bluemont advised its clients and managed their stock portfolios, while those clients' assets were held by Schwab.

Bluemont was also a signatory to the "Broker Protocol," a standard, industry-wide agreement pursuant to which brokerage houses agree that their individual investment advisors are permitted to identify clients they bring with them into those houses and then contact and/or solicit those clients if they eventually leave the brokerage house to pursue other employment. Schwab has never been a party to the Broker Protocol.

From January 2010, when Wagner joined Bluemont, until Bluemont ceased operations in October 2013, the sole members of Bluemont were Stys, Carolyn Stys and Wagner.  Each of these individual Defendants had an ownership agreement and a compensation agreement with Bluemont.  All compensation agreements were dated October 15, 2011 and were in effect when the events pertaining to Schwab's claims took place.  The Styses' compensation agreements entitled them to receive monthly compensation "based on the quarterly revenues of the firm and paid in arrears for the previous quarter."  Defendants' Memorandum in Support of Defendants'

Motion for Summary Judgment ("Defs.' Mem. Supp. Defs.' Mot."), Ex. 4 at 2-3.  Additionally, the Styses had a continuing entitlement to any unpaid amounts due to lack of "cash flows."  *Id.*  Wagner's compensation scheme was different: he was entitled to forty percent of revenues generated from clients attributable to him, minus healthcare costs, to be paid monthly in arrears as well as three percent[2] of revenue generated for the previous year starting in the fourth quarter of 2011 and paid monthly in arrears.  *Id.* at 4.  In addition, each of these individual Defendants was entitled as an owner of the firm to an equity distribution equal to his or her ownership interest.[3]  *Id.* at 2-4.

On March 4, 2011, an investment advisor with Schwab named Michael Duprey ("Duprey") resigned from Schwab and began employment with Bluemont.  Defs.' Mem. Supp. Defs.' Mot. ¶ 5.  Shortly thereafter, Schwab complained to Bluemont that Duprey was improperly soliciting Schwab's clients while at Bluemont, given that Schwab was not part of the Broker Protocol.  On April 8, 2011, Schwab terminated its contract with Bluemont, and on April 13, 2011, Schwab notified Bluemont's clients it was servicing that Schwab's contract with Bluement was being terminated effective July 18, 2011.  Schwab advised them to decide whether to remain with Schwab, independent of Bluemont, or transfer their accounts to a broker-dealer other than Schwab.

In May 2011, Bluemont replaced its arrangement with Schwab with a similar contractual arrangement with Pershing Advisors Solutions, L.L.C. ("Pershing").  Between May and July

---

[2] The compensation was set to increase to four percent in the first quarter of 2012 and to five percent in the second quarter of 2012.  *Id.*
[3] Initially, Carolyn Stys had a ninety percent ownership interest and her husband, Mark Stys, had a ten percent ownership interest in Bluemont.  Defs.' Mem. Supp. Defs.' Mot. ¶ 1.  When Wagner joined Bluemont in January 2010, his ownership interest was five percent but had increased to twenty-five percent by the time he left Bluemont in July 2013, *id.* ¶ 3, with a corresponding reduction in Carolyn Stys' ownership interest to seventy percent and Mark Stys' ownership interest to five percent.  *Id.*, Ex. 4.

2011, all of Wagner's and Stys' clients and all but two of Duprey's clients made the decision to transfer their accounts to the Pershing platform and remain with Bluemont.

In June 2012, Schwab filed a U5 Separation Disclosure Form with FINRA, thereby beginning arbitration proceeding against Bluemont.[4]  On February 19, 2013, Schwab obtained an arbitration award against Bluemont in the amount of $311,294.50.  On July 11, 2013, this Court affirmed the arbitration award and entered judgment accordingly in favor of Schwab and against Bluemont.[5]  *See Charles Schwab & Co. v. Duprey*, Civil Case No. 1:11-cv-427-AJT-TCB (E.D. Va. July 11, 2013) (consolidated with *Bluemont Capital Advisors, LLC v. Charles Schwab & Co.*, Civil Case No. 1:13-cv-0380-AJT-TCB).  *Id.* ¶ 9.[6]  As a result of the arbitration award and this Court's judgment, Bluemont was rendered insolvent on February 20, 2013, and Schwab has been a creditor of Bluemont continuously since February 20, 2013.[7]  From January 1, 2013 through July 2, 2013, Bluemont distributed to the individual Defendants a total of $290,050 for amounts due and owing under their compensation agreements.[8]

On April 29, 2013, Carolyn Stys formed an entity known as Integrated Analytics, which leased the same space that Bluemont occupied, and simultaneously continued to operate Bluemont as it wound down its operations.  Defs.' Mem. Supp. Defs.' Mot. ¶ 16.

On May 28, 2013, Mark Stys and Wagner formed WS Wealth, and in July 2013, WS Wealth joined the Broker Protocol.  On July 2, 2013, Wagner and Mark Stys resigned from

---

[4] The arbitration took place before a Dispute Resolution Panel of FINRA.  Schwab claimed that its former employee Duprey used Schwab's confidential information improperly to solicit Schwab clients for Bluemont.  It sought, and ultimately obtained, an award for treble damages under the Virginia Business Conspiracy Act, plus arbitration fees.
[5] The total amount of the entered judgment was $312,294.50, with interest accruing at the Virginia judgment rate of interest, beginning on February 20, 2013.
[6] The Court also affirmed a preliminary injunction (previously entered by stipulation), which provided for the return of Schwab's customer list and otherwise enjoined Schwab's former employee Duprey from engaging in additional business with those clients.
[7] In addition to the debt owed to Schwab, Bluemont also owed, and continues to owe, $500,000 for services rendered by two law firms from 2012-2013.  *Id.* ¶ 17.  Bluemont was also unable to pay Carolyn Stys her full salary from 2008-2013, and she is still owed $195,365.
[8] Carolyn Stys was paid $54,550, Mark Stys, $72,000, and John Wagner, $165,000.

Bluemont, identified their respective clients, and became the sole owners of WS Wealth. *Id.* ¶ 14. As of July 2013, Bluemont managed $106 million in client funds, with a total of fifty-six clients, all but three of whom transferred their accounts totaling $91 million in investments to WS Wealth.

Wagner and Mark Stys initially operated WS Wealth out of their respective homes from July 2013 until October 2013. In October 2013, Integrated Analytics, through Carolyn Stys, purchased the furniture, fixtures, and equipment of Bluemont and subsequently sold them to WS Wealth. Integrated Analytics also leased the same space that Bluemont had occupied and then subleased that space to WS Wealth, pursuant to an oral agreement. Therefore, beginning in October 2011, Bluemont, Integrated Analytics, WS Wealth, Stys, and Wagner all worked out of the same space that was previously used exclusively by Bluemont. In October 2013, Bluemont ceased operations, and Andrew Casteel, its remaining Vice President of Wealth Management, moved to WS Wealth.

On February 3, 2014, Carolyn Stys, acting as an authorized individual on behalf of Bluemont as a debtor, filed a voluntary petition for bankruptcy protection under Chapter Seven of the Bankruptcy Code. *In re Bluemont Capital Advisors, LLC*, Case No. 14-10397-RGM (Bankr. E.D. Va. Jan. 27, 2016). The 2014 bankruptcy was closed on January 27, 2016 with no distribution to creditors based on a finding that no property was available for distribution. *Id.*, Doc. Nos. 48, 51.

## II.      STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty*

6

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).

The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

### III.    ANALYSIS

#### A.    <u>Count I</u>: Successor Liability

Under Virginia law,[9] a company that purchases or receives the assets of another company generally is not liable for the debts and liabilities of the company selling those assets. *See Kaiser*

---

[9] In a diversity action such as this, the state law of the forum supplies the rules of decision. 28 U.S.C. § 1652; *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Here, in their briefings, the parties have assumed without discussion that Virginia state law applies.

*Found. Health Plan of the Mid-Atlantic States v. Clary & Moore, P.C.*, 123 F.3d 201, 204 (4th Cir. 1997); *In re SunSport, Inc.*, 260 B.R. 88, 104 (Bankr. E.D. Va. 2000).  However, there are four notable exceptions to this rule that have been recognized under Virginia law:

> In order to hold a purchasing corporation liable for the obligations of the selling corporation, it must appear that (1) the purchasing corporation expressly or impliedly agreed to assume such liabilities, (2) the circumstances surrounding the transaction warrant a finding that there was a consolidation or de facto merger of the two corporations, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is fraudulent in fact.

*Kaiser*, F.3d. at 204.  *See also Harris v. T.I., Inc.*, 413 S.E.2d 605, 609 (Va. 1992); *In re SunSport, Inc.*, 260 B.R. at 104.  Plaintiff alleges that exceptions three (mere continuation) and four (de facto merger) apply to this case.[10]

As an initial matter, the Defendants contend that the exceptions to the ban on successor liability apply only to sales transactions, relying principally on *Harris v. T.I., Inc.*, 413 S.E.2d 605, 609 (Va. 1992).  *Harris* was decided within the context of a sales transaction, but nothing in the *Harris* court's reasoning suggests that the Supreme Court of Virginia intended to limit its holding to a sales transaction; and other courts have concluded that under Virginia law, successor liability *does* extend outside of the context of a sales transaction.  *See, e.g.*, *Kaiser*, F.3d. at 204; *In re SunSport, Inc.*, 260 B.R. at 104.  Although the Supreme Court of Virginia has not explicitly decided that issue, the Court concludes pursuant to its obligations under *Erie*, 304 U.S. 64, that the Supreme Court of Virginia would decide that the exceptions identified in *Harris* apply outside the sales context and to limited liability companies.

### 1.    Mere Continuation

Courts have considered the mere continuation exception as the most compelling basis on which to impose successor liability.  *See Kaiser*, 123 F.3d at 205.  To determine whether there is

---

[10] Plaintiff separately alleges fraud as its own count, Compl. ¶¶ 28-29, but not as a basis for successor liability.

a sufficient continuity between two companies, courts have typically considered (1) whether and to what extent there is an identity of ownership (the most important factor), (2) how the nature and scope of two businesses compare; (3) whether there has been an asset transfer for less than adequate consideration; (4) whether two separate entities still remain after the transaction; (5) whether the new company continues in the same trappings as the old company, such as the same address, the same physical space and the same phone numbers; and (6) how the two companies' assets compare. *See id.* at 205.  Overall, "courts must not elevate form over substance when addressing the issue of successor liability." *Id.* (citation omitted) (internal quotation marks omitted).

Here, once Schwab obtained an arbitration award and judgment against Bluemont, which was rendered insolvent as a result, Bluemont's members clearly engaged in a series of transactions designed to thwart Schwab's ability to collect its judgment from Bluemont. Bluemont began winding down its business activities, Stys and Wagner formed WS Wealth and took steps to have all of Bluemont's customers transfer their business to WS Wealth, Bluemont was rendered unable to continue servicing those customers, WS Wealth acquired the same space as that occupied by Bluemont and some of its equipment, and shortly thereafter, Bluemont ceased to operate entirely.  While these events occurred in steps and with some involvement of Integrated Analytics, which was a separate legal entity from Bluemont, that intermediary was controlled by the majority member of Bluemont, Carolyn Stys.  In short, the individual Defendants acted according to a pre-arranged plan to dismantle Bluemont as an operating entity and continue Bluemont's business through WS Wealth, created for the purpose of continuing the same business as Bluemont, with effectively the same members and employees servicing the same clients out of the same office through the same third-party broker-dealer: Pershing.  As a

9

practical matter, and certainly from the clients' perspective, little, if anything, had changed other than that the name of Bluemont had changed to WS Wealth. While the formal ownership and management structure as between Bluemont and WS Wealth was not identical, the only real difference was that Mark Stys alone, rather than Mark and his wife, Carolyn, owned a membership interest along with Wagner in WS Wealth, but for the purpose of the successor liability analysis, the interests of the Styses collectively must be considered in evaluating an identity of ownership as between Bluemont and WS Wealth.[11]

Defendants also contend that there was not an identity of ownership because Carolyn Stys was the sole founder of Bluemont and served as its sole manager, chief administrative officer, and operating officer throughout its existence but had no role in WS Wealth. Whatever her initial role in Bluemont may have been, by the time WS Wealth was formed, the record is clear that all three, the Styses and Wagner, played management roles, to varying extents, with respect to Bluemont's cessation of business and WS Wealth's founding. Carolyn Stys' lack of formal involvement in WS Wealth, under the particular facts of this case, is immaterial for the same reasons that her lack of a formal ownership interest in WS Wealth is immaterial.

---

[11] The record does not reflect the respective ownership interests in WS Wealth as between Wagner (who owned twenty-five percent of Bluemont) and Mark Stys (who owned five percent of Bluemont but whose wife owned seventy percent of Bluemont.) Nevertheless, whatever the ownership allocation in WS Wealth is, there would be an identity of ownership between Bluemont and WS Wealth after application of the standard attribution rules used in a variety of circumstances in order to avoid elevating "form over substance" in assessing a transaction. *See Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 274 (1st Cir. 1997); *Technic Eng'g Ltd. v. Basic Envirotech, Inc.*, No. 97 C 4674, 1998 WL 173240, at *5 (N.D. Ill. Apr. 9, 1998) (finding sufficient continuity of ownership where the first company's sole shareholder owned no shares in the successor corporation but his wife and children owned shares and assumed significant management roles); *In re Acme Sec., Inc.*, 484 B.R. 475, 488 (Bankr. N.D. Ga. 2012) (finding that spouses ordinarily constitute a single economic unit for purposes of determining continuity of ownership in a successor liability lawsuit); *Park v. Townson & Alexander, Inc.*, 679 N.E.2d 107, 110 (Ill. App. Ct. 1997) ("[W]hile the spousal relationship between the owners of the corporations does not in itself establish a continuity of shareholders, it is certainly a factor which can be considered."); *Steel Co. v. Morgan Marshal Indus., Inc.*, 662 N.E.2d 595, 600 (Ill. App. Ct. 1996) ("We cannot allow the law to be circumvented by an individual exerting control through his spouse."); *c.f. Hoppa v. Schermerhorn & Co.*, 630 N.E.2d 1042, 1046 (Ill. App. Ct. 1994) (A reduction in the former joint tenant shareholder's interest to two percent and the addition of a new family member as shareholder to the successor corporation does not prevent a finding of continuity of ownership.).

The individual Defendants point to their clients' unqualified right to change investment advisors and their own rights to solicit Bluemont customers once they departed Bluemont under the Broker Protocol.  For those reasons, they contend, Bluemont had no "assets" to transfer and in fact, did not transfer any "assets" to WS Wealth.  But these contractual arrangements do not insulate WS Wealth from the consequences that flow from the exercise of those rights in a way that resulted in WS Wealth's simply continuing Bluemont's business under a different name.  Likewise, that WS Wealth expanded upon the services that Bluemont offered, which came to include a hedge fund and a small business development focus, does not change the fundamental character of WS Wealth as a mere continuation of Bluemont.  Both companies were in the business of wealth management, and nearly all of the business performed by Bluemont is now being performed by WS Wealth for essentially the same client base.

By way of summary, while the two companies did not have perfectly identical formal ownership and management structures and had different names, phone numbers, websites, and scopes of services, both were effectively operating the same type of business.  Only one company existed before and after the "restructuring," and each company serviced essentially the same client base through the same owners or an owner's spouse.  Furthermore, each company used the same employees and platform, while occupying the same physical space.  Upon weighing the factors discussed in *Harris*, *Kaiser*, *In re SunSport*, and *Crawford*, the Court finds and concludes as a matter of law, based on the undisputed facts, that WS Wealth is a mere continuation of Bluemont and therefore is a successor to Bluemont, responsible for Schwab's judgment against Bluemont.

### 2.   De Facto Merger Exception

A company will be deemed a successor to another under the de facto merger exception

where there is

> (1) continuity of management, personnel, physical location, assets, and general business operations (i.e., continuity of enterprise); (2) continuity of ownership; (footnote omitted) (3) prompt cessation of the seller corporation's operations; and (4) assumption by the purchaser of obligations ordinarily necessary for the uninterrupted continuation of normal business operations of the seller.

*Crawford Harbor Assocs. v. Blake Constr. Co., Inc.*, 661 F. Supp. 880, 884 (E.D. Va. 1987).

"The most critical element, however, is continuity of ownership." *Id.* For essentially the same

reasons that led the Court to conclude that WS Wealth is a mere continuation of Bluemont, the

Court also concludes as a matter of law that WS Wealth is a successor to Bluemont under the de

facto merger exception.[12]

### 3.   The Statute of Limitations

Defendants contend that Schwab's successor liability claim is governed by a two year

statute of limitations[13] and is therefore time barred since Schwab did not file its claim until April

---

[12] Defendants argue that "although there are reported cases recognizing the concept of de facto merger, . . . as a matter of law there can be no such thing as a de facto merger in Virginia," principally because the Virginia State Corporation Commission ("SCC") has exclusive jurisdiction to authorize a merger, and therefore, "neither this Court nor any other Court can review that issue other than the Virginia Supreme Court." Defs.' Mem. Supp. Defs.' Mot. 8. Defendants also contend that, even if this Court does recognize the de facto merger exception, there was no de facto merger here given the lack of identity in ownership and no assumption of liabilities. The Court finds no merit in any of these positions. First, courts applying Virginia law, including the Supreme Court of Virginia, have repeatedly recognized the de facto merger exception. *See, e.g., Harris*, 413 S.E.2d at 609; *Kaiser*, 123 F.3d at 204; *Crawford Harbor Assocs.*, 661 F. Supp. at 884. Second, while only the SCC is authorized by statute to authorize a merger, a de facto merger is one that, by definition, is not officially effectuated but has occurred in fact as part of efforts to conceal the merger in order to avoid legal liabilities. This equitable doctrine was created to address such a situation, as occurred here, and is predicated on the absence of a legal and SCC authorization. Third, as the Court has already concluded as a matter of law, there is sufficient identity of ownership between the two entities, given that the only difference in ownership structure is that the wife of one of the members is a named member in Bluemont but not WS Wealth. Finally, while there were no past debts or liabilities assumed, WS Wealth essentially stepped into the shoes of Bluemont with respect to ongoing operating expenses and obligations.

[13] *See* Va. Code. Ann. § 8.01-243 ("Unless otherwise provided in this section or by other statute, every action for personal injuries, whatever the theory of recovery, and every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues."). Defendants contend in this regard that because the successor liability claim is based on a "predicate claim" of fraud, it is subject to a two year limitations period that begins when the fraud was discovered or should have been discovered through the exercise of due diligence, which

1, 2016, which was more than two years after Schwab first claimed that as of March 2014,

Bluemont's members were operating out of WS Wealth.  In that regard, Defendants contend that

Virginia's twenty year limitations period applicable to the enforcement of judgments[14] does not

apply since it applies, by its terms, only to actions on a judgment – not to claims against an

alleged successor against whom no judgment has yet been obtained.  Defendants also contend

that any applicable limitations period was not tolled under Virginia's bankruptcy obstruction

statute[15] as a result of the Bluemont bankruptcy proceedings because Bluemont – not WS Wealth

– filed for bankruptcy and had an "absolute right" to do so.  Defendants' Memorandum in Reply

in Support of Defendants' Motion for Summary Judgment [Doc. No. 55] ("Defs.' Reply Supp.

Defs.' Mot.") 3-4.

The Supreme Court of Virginia has not ruled on what limitations period applies to a

claim of successor liability for a judgment already obtained against an alleged predecessor.

Nevertheless, based on the text of the applicable statute, the Court concludes that a twenty year

limitations period applies to Schwab's successor liability claim since it is based on a judgment

Schwab already obtained and is therefore an "action on a judgment," rather than an action to

impose still undetermined liabilities of an alleged predecessor on an alleged successor.  Second,

the Court concludes that, apart from whatever limitations period applies, any applicable

limitations period was tolled during Bluemont's bankruptcy proceedings.  Even though

---

Defendants claim occurred no later than March 20, 2014 when Plaintiff's lawyer wrote to the Trustee in Bluemont's Chapter Seven bankruptcy case arguing that WS Wealth was a successor to Bluemont.  *See* Defs.' Mem. Supp. Defs.' Mot. 4.

[14] Va. Code. Ann. § 8.01-251(A) provides in pertinent part that "[n]o execution shall be issued and no action brought on a judgment . . . after 20 years from the date of such judgment or domestication of such judgment, unless the period is extended as provided in this section."

[15] Va. Code. Ann. § 8.01-229(D) provides:

> [w]hen the filing of an action is obstructed by a defendant's (i) filing a petition in bankruptcy or filing a petition for an extension or arrangement under the United States Bankruptcy Act or (ii) using any other direct or indirect means to obstruct the filing of an action, then the time that such obstruction has continued shall not be counted as any part of the period within which the action must be brought.

Bluemont  –  not WS Wealth – was involved in bankruptcy proceedings, those proceedings obstructed Schwab's ability to pursue its judgment against WS Wealth, as Bluemont's successor. The claim that Schwab now brings was, at that time, an asset of the bankruptcy estate and could be asserted on behalf of creditors such as Schwab only by the bankruptcy trustee until the trustee abandoned that claim or the bankruptcy closed.  *See Nat'l. Am. Ins. Co. v. Ruppert Landscaping Co.*, 18 F.3d 439, 441 (4th Cir. 1999) ("[U]ntil there is an 'abandonment' by the trustee of his claim the individual creditor has no standing to pursue it.").

Given WS Wealth's status as a mere continuation of Bluemont and a Bluemont member's instituting Bluemont's bankruptcy proceedings as its authorized representative, WS Wealth qualified under the bankruptcy obstruction statute as a "defendant[] . . . using a[] . . . direct or indirect means to obstruct the filing of an action . . . ."  Va. Code. Ann. § 8.01-229(D).  The Court therefore concludes that any applicable limitations period on Schwab's successor liability claim, filed on April 1, 2016, was tolled from February 3, 2014, when Bluemont's Chapter Seven proceeding was instituted, until January 27, 2016, when the bankruptcy case was closed with no distribution to creditors.  For this reason, Schwab's successor liability claim, as well as its claims for fraud (Count II), conspiracy (Count III), breach of fiduciary duty (Count IV), aiding and abetting breach of fiduciary duty (Count V), and imposition of trust (Count VI), which all accrued in July 2013, at the earliest, were all timely filed, regardless of whether the applicable limitations period is two years or some greater length of time.

For the above reasons, the Court grants Schwab's motion for summary judgment and denies WS Wealth's motion as to Count I.  WS Wealth is therefore liable for the full amount of $312,294.50 with interest at the Virginia judgment rate from February 20, 2013.

### B.    **Count II**: Fraud

In Count II, Schwab asserts against WS Wealth, separate and apart from its successor

liability claim in Count I, a claim for "fraud," for which Schwab seeks the same relief as in

Count I, a judgment based on the judgment obtained against Bluemont.  The substance of that

claim, however, as alleged, is indistinguishable from its successor liability claim based on the

"mere continuation" exception, discussed above;[16] and Schwab has failed to allege or prove the

elements of common law fraud,[17] particularly in light of the absence of a breach of fiduciary

duty on the part of the individual Defendants, as discussed below.  For these reasons, Schwab's

motion for summary judgment on Count II is denied, and the Defendants' motion for summary

judgment on Count II is granted.

### C.    **Count III**: Conspiracy

Schwab has filed a claim for conspiracy against WS Wealth on the grounds that Wagner

and the Stys "did combine, associate, agree, mutually undertake or concert together for the

purpose of willfully and maliciously injuring Charles Schwab."  Compl. ¶ 31.  Based on this

conspiracy claim, Schwab seeks damages in the amount of its judgment obtained against

---

[16] Schwab's alleged basis for this claim, in its entirety, is that "[t]he creation of WS Wealth at the time when
Bluemont was insolvent, the transfer of its clients  to WS Wealth, the continuation by WS Wealth of Bluemont's
business from the same address when WS Wealth had common identical ownership was made with intent to hinder,
delay or defraud Charles Schwab others."  Compl. ¶ 29.

[17] Virginia specifically requires that six independent elements be pled: "(1) a false representation, (2) of a material
fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6)
resulting damage to the party misled."  *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994).
Furthermore, fraud claims are subject to a heightened pleading standard under Federal Rule of Civil Procedure 9(b),
which requires that, "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud
. . . ." Fed. R. Civ. P. 9(b).  The plaintiff must plead with particularity "the time, place, and contents of the false
representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."
*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted) (internal
quotation marks omitted).  Thus, "[g]eneralized, nonspecific allegations . . . are insufficient to state a valid claim of
fraud."  Ward's Equipment, 493 S.E.2d at 520.  "[L]ack of compliance with Rule 9(b)'s pleading requirements is
treated as a failure to state a claim under Rule 12(b)(6)."  *Harrison*, 176 F.3d at 783 n.5.

Bluemont, $312,294.50, trebled under the Virginia business conspiracy statute,[18] to $936,883.50, with interest as well as attorney's fees and costs.

This claim fails as a matter of law under the intra-corporate conspiracy doctrine, as recognized in Virginia.  *See Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987) ("If the defendants were acting within the scope of their employment . . . then only one entity exists . . . . By definition, a single entity cannot conspire with itself."); *see also Phoenix Renovation Corp. v. Rodriguez*, 403 F. Supp. 2d 510, 517 (E.D. Va. 2005) ("[A] conspiracy between a corporation and agents of that corporation acting within the scope of their employment is a legal impossibility.").  Here, at all material times, Wagner and the Styses were acting in their capacities as members and managers of WS Wealth and therefore could not have engaged in a cognizable conspiracy with WS Wealth to injure Schwab.  The alleged conspiracy therefore did not involve two or more "persons."  Plaintiff's motion for summary judgment is therefore denied and Defendants' motion, granted as to Count III.

D.      <u>Count IV and V</u>: **Breach of Fiduciary Duty/Aiding and Abetting Breach of Fiduciary Duty**

Schwab seeks a judgment against the individual Defendants on the grounds that they either breached, or aided and abetted the breach of, fiduciary duties that they owed as members

---

[18] The Virginia Business Conspiracy statute provides:

> Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty . . . .

Va. Code. Ann. § 18.2-499.  Any person injured by a violation of this section "may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel . . . ." *Id.* § 18.2-500.  The intent required is legal malice or "proof that the defendant acted intentionally, purposefully, and without lawful justification," and conspiracy "do[es] not require a plaintiff to prove that a conspirator's primary and overriding purpose is to injure another in his trade or business."  *Simmons v. Miller*, 544 S.E.2d 666, 676-77 (Va. 2001).

or managers of Bluemont, a debtor of Schwab.[19]  According to Schwab, Defendants breached that duty by continuing to draw over $1.6 million in salaries from Bluemont and WS Wealth without satisfying Schwab's judgment, even though Bluemont entered "the zone of insolvency" and became insolvent in February 2013.  As Schwab sees it, "the Styses and Wagner orchestrated the systematic looting of Bluemont for their own pecuniary gain . . . . in complete derogation of their duties to creditors."  *Id.* 12; *see also* Compl. ¶ 35 (alleging that these Defendants distributed to themselves "salaries, commissions, and other compensation" out of Bluemont's funds that should have been paid to Schwab in satisfaction of its judgment and then "transferred to WS Wealth, without consideration, clients with a portfolio of approximately $75 million.").  Schwab seeks to impose this liability on these individual Defendants on the theory that the individual Defendants had the same duties to creditors as the directors of an insolvent corporation.

The Supreme Court of Virginia has never explicitly addressed whether members or managers of an insolvent L.L.C. have duties to creditors.[20]  The Court must therefore predict how the Supreme Court of Virginia would decide two unsettled issue under the Virginia Limited Liability Company Act ("VLLCA"), Va. Code Ann. §§ 13.1-1000-1080.  The first is whether and under what circumstances a member or manager of an L.L.C. owes the L.L.C.'s creditors fiduciary duties when the L.L.C. becomes insolvent.  The second is, if L.L.C. members or

---

[19] In Count IV, Schwab alleges a breach of fiduciary duty only against Wagner and Mark Stys "as the sole members of Bluemont."  Compl. ¶ 34.  In its summary judgment motion, however, Schwab has argued that this claim applies to all of the individual Defendants.  *See* Defs.' Mem. Supp. Defs.' Mot. 11-12.

[20] This Court therefore has the option of either (1) certifying the question to the Supreme Court of Virginia or (2) determining how the Supreme Court of Virginia would likely resolve the case on the basis of related matters it has already decided as well as persuasive authority from other jurisdictions.  Rule 5:42(b) of the Rules of the Supreme Court of Virginia states that certification of a question is appropriate if "determinative in any proceeding pending before the certifying court, and it appears there is no controlling precedent on point in the decisions of the Supreme Court or the Court of Appeals of Virginia."  However, for a variety of reasons, "[c]ertification is an exceptional procedure that should be invoked only rarely at the district court stage."  *Bank of America v. Musselman*, 222 F. Supp. 2d 792, 796 (E.D. Va. 2002).  Accordingly, this Court declines to certify the question to the Supreme Court of Virginia and will instead look to related Virginia case law and settled principles of corporate law for guidance.

managers do owe such duties, whether that duty is breached when a member or manager receives

authorized compensation without satisfying the L.L.C.'s debts or by causing its clients to join

that member or manager at another company.

**1.    Whether a Member or Manager of an Insolvent L.L.C. Owes Fiduciary Duties to the L.L.C.'s Creditors[21]**

The VLLCA comprehensively defines the rights, duties and obligations of an L.L.C., its

members, and its managers.  Like the shareholders of a corporation and unlike the general

partners of a partnership, the members of a Virginia limited liability company generally enjoy

limited liability, as set forth in Va. Code Ann. § 13.1-1019:

> Except as otherwise provided by this Code or as expressly provided in the articles of organization, no member, manager, organizer or other agent of a limited liability company . . . shall have any personal obligation for any liabilities of a limited liability company . . . solely by reason of being a member, manager, organizer or agent of a limited liability company.

*See A.G. Dillard, Inc. v. Stonehaus Constr., LLC, et al.*, No. 151182, 2016 WL 3213630, at *2

(Va. June 2, 2016) ("Generally, when a plaintiff has a claim against a limited liability company,

the plaintiff may only pursue that claim against the limited liability company itself and not its

members."); *see also Anderson v. Bundy*, 171 S.E. 501, 508 (Va. 1933) (Generally, "no direct

action lies to a creditor of a corporation against its directors . . . for improper performance or

failure in performance of their duties.)

Management of a limited liability company is "vested in its members" unless the articles

of organization or an operating agreement provides for management by a manager or managers.

Va. Code Ann. § 13-1022(A).  "A manager shall discharge his or its duties as a manager in

---

[21] For the purposes of this analysis, the Court assumes, without deciding, that there are genuine issues of material fact concerning whether Wagner and Mark Stys were "managers" of Bluemont at the time that they engaged in the conduct relied upon by Schwab for the purposes of its breach of fiduciary duty claim.

accordance with the manager's good faith business judgment of the best interests of the limited liability company." *Id.* § 13.1-1024.1(A).

"An operating agreement may provide that . . . [a] member or manager who fails to perform in accordance with, or to comply with terms and conditions of, the operating agreement shall be subject to specified penalties or specified consequences . . . ." *Id.* § 13.1-1023.1(A). "'Operating agreement' means an agreement of the members as to the affairs of a limited liability company and the conduct of its business . . . ." *Id.* § 13.1-1002.

The VLLCA also strikes a balance between the rights of members to receive distributions and protections afforded to creditors. In that regard, before the dissolution and winding up of an L.L.C., a member is entitled to receive distributions from an L.L.C. as authorized in the articles of organization or an operating agreement. *Id.* § 13.1-1031. However, no "distribution" may be made by an LLC if, after giving effect to the distribution, the L.L.C. would (1) "not be able to pay its debts as they become due in the usual course of business," *id.* § 13.1-1035(A)(1), or (2) the L.L.C.'s "total assets would be less than the sum of its total liabilities plus [certain other preferential rights of members," *id.* § 13.1-1035(A)(2). Furthermore, upon the winding up of an L.L.C., the assets of the L.L.C. are to be distributed, first, "to creditors, including members who are creditors, to the extent permitted by law, in satisfaction of liabilities of the limited liability company other than for distributions to members under § 13.1-1031" and then, to members and former members. *Id.* § 13.1-1049.

However, these protections are subject to an important qualification: an L.L.C.'s member has what appears to be an unqualified right to receive from the L.L.C. reasonable compensation for past or present services. *Id.* § 13.1-1035(E) ("the term 'distribution' shall not include amounts constituting reasonable compensation for present or past services or reasonable

payments made in the ordinary course of business pursuant to a bona fide retirement plan or other benefits program."). This provision protecting a member's authorized compensation or benefits, ostensibly even during insolvency or when the payments would cause insolvency, appears to reflect the underlying legislative intent that the VLLCA is "expressly intended to permit the enforcement as a fundamental matter of contract among the members of a limited liability company of any provision of an operating agreement," *id.* § 13.1-1001.1(B), and that the VLLCA "be construed in furtherance of the policies of giving maximum effect to the principle of freedom of contract and of enforcing operating agreements," *id.* § 13.1-1001.1(C). And even with respect to unauthorized distributions to members, the VLLCA lists the L.L.C. as the only entity to which a member is liable for a wrongful distribution. *Id.* § 13.1-1036 ("If a member has received a distribution in violation of the articles of organization or an operating agreement or in violation of § 13.1-1035 of this chapter, then the member is liable to the limited liability company for a period of two years thereafter for the amount of the distribution wrongfully made.").

Against this statutory scheme, the Court has considered Schwab's claim that a member or manager of an L.L.C. has fiduciary duties to a creditor such as Schwab once the L.L.C. enters "the zone of insolvency." Although the Supreme Court of Virginia has not directly addressed this issue, the Court concludes that were this issue presented to the Supreme Court of Virginia, the Supreme Court of Virginia would conclude as a matter of law based on the text and structure of the VLLCA that Schwab does not have standing to sue any of the members of either Bluemont of WS Wealth for breach of fiduciary duty based on a wrongful distribution to its members. Section 13.1-1036, in particular, which identifies only the L.L.C. when describing to whom a member is liable wrongful distribution, together with the overall text and structure of the

20

VLLCA, strongly supports the conclusion that the rights and liabilities of members and managers have been carefully crafted and balanced against the rights and protections to be afforded creditors.

This conclusion is also consistent with decisions of the Supreme Court of Virginia that have discussed other issues pertaining to an L.L.C. and its members or managers. For instance, in *Remora Investments, L.L.C., v. Orr*, 673 S.E.2d 845 (Va. 2009), a member of an L.L.C. sued a member-manager for breach of fiduciary duty directly, rather than derivatively on behalf of the L.L.C. The Supreme Court of Virginia acknowledged that it had previously "analogized the fiduciary duties of managers in an L.L.C. to the fiduciary duties of corporate directors." *Remora*, 673 S.E. 2d at 847 (citing *Flippo v. CSC Associates III, L.L.C.*, 547 S.E.2d 219 (Va. 2001).[22] It rejected, however, the suggestion that a member had standing to sue another member or manager directly, rather than derivatively, because (1) "nothing in the statutory provisions relating to L.L.C.s provide for fiduciary duties between members of an L.L.C. or between a member and a manager of an L.L.C.," *id.* at 849, and (2) an "[L.L.C's] operating agreement d[oes] not establish fiduciary duties between members or between a member and a manager," *id.* at 848. The court observed that if the members and the L.L.C. wish to "vary commercial rules by contract, they are free to do so" by including such provisions in an L.L.C.'s operating agreement. *Id.* (quoting *Simmons*, 544 S.E.2d at 675 (Va. 2001)) (internal quotation marks omitted).[23] It also held that

---

[22] In *Flippo*, a member of an LLC filed an action individually and derivatively against the manager of an L.L.C. for, among other things, breach of fiduciary duty. The Supreme Court held that a manager of an L.L.C., like a director of a corporation, should be protected under the business judgment rule, as codified in section 13.1-1024.1(A), only for acts related to the exercise of business judgment on behalf of the L.L.C. *Flippo*, 547 S.E.2d at 221-22.

[23] It also recognized that the "[g]eneral standards of conduct for a manager," set forth in section 13.1-1024.1of the VLLCA and the "[g]eneral standards of conduct for director," set forth in Virginia's Stock Corporation Act, "have almost identical language." *Id.* The Court observed that "[n]othing in either of these code provisions imposes duties between members of an L.L.C., between members and managers of the L.L.C., between stockholders of a corporation, or between individual shareholders and officers and directors." *Id.* The court found significant that "[b]y contrast, general partnership law in Virginia provides that 'a partner owes to the partnership *and the other partners* . . . the duty of loyalty and the duty of care.'" *Id.* (quoting Va. Code Ann. § 50-73.102(A)). The court observed, however, that "[a]nalogous case law relating to corporations does not provide such [fiduciary] duties [by

"[o]ur holdings in [prior cases] do not support [the] contention that we have previously approved direct causes of action by individual shareholders against directors and should likewise permit such actions by members of an L.L.C. against a manager." [24] *Id.*

Here, Schwab effectively concedes *sub silentio* that a member has no fiduciary obligation to it under either an express provision of the VCLLA or under the articles of organization or operating agreement of either Bluemont or WS Wealth. Rather, it contends that because the Supreme Court of Virginia has likened the duties and obligations of an L.L.C. manager to those of a corporate director and corporate directors have obligations to creditors once the corporation becomes insolvent, the individual Defendants as members or mangers of Bluemont likewise had fiduciary obligations to Schwab, which they breached when they distributed to themselves amounts that caused the insolvency of Bluemont. According to Schwab, the individual Defendants continued to breach those duties when they continued distributions to themselves from the coffers of WS Wealth without satisfying Schwab's judgment. What that position overlooks, however, is that the VLLCA, unlike the Virginia Stock Corporation Act, expressly identifies the entity to whom a member is liable for an unauthorized distribution and lists only the L.L.C. itself. *See* Va. Code Ann. § 13.1-1036. For that reason, recognizing a direct cause of action by a creditor against a member or manager would undermine a carefully crafted legislative scheme.[26]

---

directors to shareholders individually]," *id.* at 849, and rejected the contention that its prior decisions "by analogous application of corporate law, establish that managers of L.L.C.s owe its members fiduciary duties." *Id.* at 847-48.

[24] The court also concluded that because the alleged injury was sustained by the L.L.C. as well as by the member, there was no basis upon which to formulate or adopt an exception to the derivative suit requirement, as the Delaware Supreme Court has adopted, *see Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), where the shareholder's injury is "independent of any alleged injury to the corporation" and the shareholder "can prevail without showing injury to the corporation," *Remora*, 673 S.E.2d at 848 (quoting *Tooley*, 845 A.2d at 1039) (internal quotation marks omitted). The court did not review the fiduciary obligations of a director to a creditor of an insolvent corporation or the applicability of that case law to a manager of an insolvent L.L.C.

[26] For these reasons, the court's decision in *A.G. Dillard*, 2016 WL 3213630, authorizing the piercing of an L.L.C. to reach its members on the same grounds that allow piercing of a corporate veil, does not support the conclusion that

At least one court outside of Virginia has likewise concluded that a creditor in Schwab's position does not have standing to sue an L.L.C. member or manager.  In *Weinstein v. Colborne Foodbotics, LLC*, 302 P.3d 263, 267 (Col. 2013), the Supreme Court of Colorado Court reasoned, based a provision nearly identical to section 13.1-1036 of the VLLCA, that because the Colorado Limited Liability Company Act specifically addressed the liability of a member or manager for a wrongful distribution and imposed liability only to the L.L.C. – not a creditor – a creditor does not have standing to bring a breach of fiduciary duty claim against the members or managers of an insolvent L.L.C.  More specifically, that court concluded that "the manager of an insolvent LLC does not owe the LLC's creditors the same fiduciary duty that an insolvent corporation's directors owe the corporation's creditors."  *Id.* at 269.  *See also CML V, LLC v. BAX, et al.*, 28 A.3d 1037 (Del. 2011) (holding that, under the Delaware L.L.C. statute, a creditor does not have standing to bring either a derivative or direct action against a member of an insolvent L.L.C. for that member's delinquent payments to the L.L.C.).[27]

For the above reasons, the Court concludes that the Supreme Court of Virginia would conclude as a matter of law that Schwab does not have standing to assert any breach of fiduciary claims against any of the individual Defendants.

---

the Supreme Court of Virginia would confer standing on a creditor to bring a direct breach of fiduciary claim against a member of an L.L.C.

[27] Finally, Plaintiff and Defendants refer at various times in support of their arguments to *Bank of America v. Musselman*, 222 F. Supp. 2d 792 (E.D. Va. 2002).  That case outlines three "extraordinary exceptions" to the general rule that directors are not personally liable to creditors of a corporation.  These three exceptions include (1) corporate veil piercing, *id.* at 797, (2) abuse of position by directors or officers during a corporation's insolvency, *id.* at 797, and (3) the "trust fund doctrine," *id.*  That case takes place entirely in the context of a corporation defendant; however, and nothing in the opinion suggests that its holding would apply outside that context.  Similarly, because the Supreme Court of Virginia has never explicitly held that corporate law should apply to an L.L.C. in the context of duties owed by managers to creditors, *Musselman*'s three noted "extraordinary exceptions" are not applicable to the resolution of the present matter.

**2.    Whether Defendants Breached Any Fiduciary Duties Potentially
Owed to Schwab?**

The Court alternatively concludes that neither the individual Defendants' taking of
compensation authorized under the operating agreements nor their causing the transfer of clients
to WS Wealth would breach any fiduciary duty owed to Schwab, even if such a duty existed.
Schwab does not contest that the amount Wagner and the Styses received was authorized as
compensation under the operating agreements, and such amounts do not therefore constitute
"distributions" for purposes of the prohibitions set forth in section 13.1-1035.  *See* Va. Code
Ann. § 13.1-1035(E) ("the term 'distribution' shall not include amounts constituting reasonable
compensation for present or past services or reasonable payments in the ordinary course of
business pursuant to a bona fide retirement plan or other benefits program.").  For this reason,
none of the individual Defendants received any amounts that would be deemed wrongful or
actionable under VLLCA sections 13.1-1035 or 13.1-1049, which are intended, at least in part, to
protect creditors.

Finally, the Court concludes as a matter of law that the VLLCA's exception to manager
non-liability in cases of "willful misconduct or a knowing violation of the criminal law" does not
apply to any of the challenged conduct on the part of the individual defendants.  *See* Va. Code
Ann. § 13.1-1025(B).  The VLLCA does not define the term "willful misconduct," and the only
published decision interpreting this provision found that the exception applies where the manager
committed fraud, embezzled funds, and undertook other willful and malicious acts.  *In re
McKnew*, 270 B.R. 593, 645 (Bankr. E.D. Va. 2001).  The individual Defendants' statutorily
sanctioned receipt of specified compensation, even during their company's insolvency, does not
constitute "misconduct."

The Court accordingly denies Plaintiff's motion and grants Defendants' motion for summary judgment as to Count IV.

###### E.      Count V: Aiding and Abetting Breach of Fiduciary Duty

Schwab separately alleges in Count V that Carolyn Stys aided and abetted Mark Stys' and Jonathan Wagner's breach of fiduciary duty.  *See* Compl. ¶¶ 37-40.[28]  Given the Court's conclusion that Schwab has no standing to assert a claim for breach of fiduciary duty or alternatively, that there was no breach of any fiduciary duty that may have been owed to Schwab, Schwab's claim that Carolyn Stys aided and abetted such a breach must also be dismissed as a matter of law.  Accordingly, Plaintiff's motion for summary judgment is denied and Defendants' motion is granted as to Count V.

###### F.      Count VI: Imposition of Trust

Plaintiff asks this Court to impose an equitable lien on all monies paid to Wagner, Mark Stys, and Carolyn Stys by both Bluemont and WS Wealth during the period of Bluemont's insolvency.  Having found that Wager and the Styses are not personally liable for Schwab's judgment, there is no basis upon which to impose a trust on any of their earnings from either Bluemont or WS Wealth.  Accordingly, Plaintiff's motion for summary judgment is denied and Defendants' motion is granted as to Count VI.

### IV.      CONCLUSION

For the above reasons, the Court finds and concludes, as a matter of law, that WS Wealth was a successor to Bluemont and responsible for the judgment entered against Bluemont, but that there is no personal liability for that judgment, in whole or in part, on the part of the individual

---

[28] In both its Memorandum in Support of its Motion for Summary Judgment, at page twelve, and its Memorandum in Opposition to Defendants' Motion for Summary Judgment, at page three, Schwab refers to this claim as "Aiding and Abetting a Conspiracy."

Defendants.  Accordingly, Plaintiff's Motion for Summary Judgment [Doc. No. 39] is

GRANTED as to its claims for successor liability (Count I) and is otherwise DENIED.

Defendants' Motion for Summary Judgment [Doc. No. 46] is GRANTED as to Plaintiff's claims

for fraud (Count II), conspiracy (Count III), breach of fiduciary duty (Count IV), aiding and

abetting breach of fiduciary duty (Count V), and imposition of trust (Count VI) and is otherwise

DENIED.[29]  Judgment will therefore be entered against Defendant WS Wealth Management,

L.L.C. on Count I in the amount of $312,294.50, with interest accruing at the Virginia judgment

rate of interest, beginning on February 20, 2013, and Counts II-VI will be dismissed.

The Court will issue an appropriate Order.

The Clerk is directed to forward a copy of this Memorandum Opinion to all counsel of

record.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
December 2, 2016

---

[29] The Court will also deny Plaintiff's three pending motions in limine [Doc. Nos. 57-59] as
moot.